We're going to give you 15 minutes each side. Does the plaintiff want to reserve some time, or the appellant want to reserve some time? It's just two minutes. Two minutes? Okay. And can you identify yourselves for the record? Sure. My name is Adam Tuesley. I represent Randhurst Crossing, which is the defendant in the underlying case and the appellant. Thank you. Mr. Tuesley? Good morning. My name is Brent Procida. I'm here from the firm Venable. I represent U.S. Bank in its capacity as trustee. The plaintiff in the underlying case and the appellee before this Court today. Thank you, Mr. Procida. Okay, Mr. Tuesley, you can proceed. Thank you. Good morning. Once again, I'm Adam Tuesley. I represent Randhurst Crossing, LLC, which is the mortgage owner on a foreclosure case or was a mortgage owner on a foreclosure case that appended in the Circuit Court of Cook County. On appeal, it appears that there are really three issues that we've raised in our brief and our reply brief. One of them takes up a good portion of the argument, and that pertains to the trial court's decision to order my client to turn over rents that were collected through the operation of the real estate prior to the date in which the receiver was appointed. The other two arguments pertain to the award of attorney's fees to the plaintiff, as we say, without the use of a proper 191 affidavit and did not attach any of the records to the affidavit to identify the specific tasks that were performed until we got to a supplemental briefing on the summary judgment motion, so the initial burden on the summary judgment wouldn't have been met on that issue. You know, on the attorney's fees issue, did you give us a record of the hearing on that? Yes. The transcript was attached. The summary judgment hearing transcript was part of the report of proceedings. No, no. I'm talking about the evidentiary hearing on the fees. There was no evidentiary hearing. What was there? It was all part of the summary judgment proceeding. It was all decided, the same hearing, just on summary judgment. Did she say something specifically then about the attorney fees? She just granted all of the attorney's fees and made it part of the order. What happened was she granted summary judgment, and then she said she was granting everything, and then the parties worked on an actual order to be entered because it was a foreclosure. I thought she had requested unredacted portions of the billings. What happened was during the course of discovery, there was a production of attorney's fees from the Appalese Council to myself. When the motion for summary judgment was filed, there was no actual records attached. There was supplemental briefing. At that point, some of these less redacted entries were attached to the supplemental briefing on the summary judgment. And so there wasn't any additional that I were – I mean, I handled this portion of it, but I don't remember her, again, ordering any additional production after that. It was all done at, like I said, one hearing on the summary judgment. The order on the summary judgment was entered after a month or six weeks after that. Well, there were some issues worked out as to the amounts to put into the actual order. It was at one hearing. I think the records show that there was a hearing on April 22nd. Are you saying that that was just a hearing on the motion? That's right. The hearing we had was on summary judgment. Did you ask for an evidentiary hearing? We did not specifically request for evidentiary hearing on that because our position was we didn't even get the records until we had the supplemental brief. They didn't meet their initial burden on summary judgment under 191 because there was no records attached. But when they supplemented it later, there were some surreplies. Yeah, it was a supplemental – Did you ask for an evidentiary hearing then? I did not. We did not. Don't you usually have to ask for one to get one? Yeah, and it's not part of our actual – You're not really claiming that's the flaw. Correct. It's the fees. Correct. It's the fees. The fact that their fees were awarded at all when they didn't meet their initial burden on summary judgment is the basis for our appeal. And then also as to some of the specific things within it that we talk about. But it wasn't an issue of an evidentiary hearing. I said the fact issue, but as long as we can talk about it. So one of the things you do point to is that there were 74 hours billed to attend hearings where there were actually local counsel and Mr. Reseda present? That's correct. Is there a case that says that there shouldn't be? Would you argue that was duplicative billings? That's correct. There was an argument at the time as well that it was. There was not a direct case on point that said having two attorneys automatically made it unreasonable. So we go a lot to the issue of reasonableness. Right. But you believe the record would show that there were fees that were charged for at least 74 hours where two attorneys were actually present and they were both billing for that time? Correct. All right. Okay. Now you can probably go back to where you want to start. No, that was the one. The $120 for a dinner. I thought it was more than that. Okay. Go ahead. No, it was just a matter of. There's travel times. You questioned whether an attorney should be billing $25,000 to, was this like from out of state or is this back and forth from the courthouse to the office? No. Mr. Prosita's office is in the East Coast. So that was the travel to come to Chicago. $25,000? In time, bill time for that. Oh, I see. Okay. Because he was billing for the hours that he was getting from here to wherever. Correct. The East Coast. Correct. But it was the hours. How many hours did he say it took him to get here? 46? There was a lot of hearings in this case in both the state court and the bankruptcy that Mr. Prosita attended. So this was over the course of three years or so. Oh, okay. So it wasn't. Oh. So I'm just asking. So when you don't ask for an evidentiary hearing, do you think there's an obligation in the travel court to have one? I don't believe so. I believe that under the current state of Illinois law, the judge can still take a look at all the records and the arguments presented and come to a determination on the reasonableness of the fees without an evidentiary hearing. Absolutely. But other than not having the affidavits. Correct. Okay? Yes. Which you claim was improper, and we'll agree it is, they were eventually supplied. But did you include in any of your pleadings in objecting to the fees the specific ones that you're arguing about now? Absolutely. All right. Okay. So we also had a supplemental brief, and all of these arguments about the breakdowns that we're talking about with the traveling and the settlement discussions, all of that was in my supplement, the supplemental brief that we filed at that time prior to the judge making her determinations. So that's all in the record. Nothing in our brief is new. It's all from things that were actually raised at the travel court level. So I think that as to the issue on the turnover of the rents, which seems to be a big portion of our briefs, I think both sides are willing to acknowledge this, that there isn't a direct case on point with similar facts as we've laid out here in a situation in which the plaintiff had sought the appointment of a receiver in the underlying foreclosure case prior to the appointment of the receiver. We filed, our client filed for Chapter 11 bankruptcy. The bankruptcy proceeded for a few years. Eventually it was dismissed, brought back to the state court, and then the judge ordered that during that time while the bankruptcy proceeded, although it wasn't proceeding in the state court, that the funds that had been collected by our client be turned over to the receiver and eventually applied to the debt. So it was required by the federal court, correct? No. There was never a requirement that they, so you're saying that there wasn't, because there was never a requirement for them to hold back the rents, that this order kind of came out of nowhere and the funds were never preserved. Is that correct? It's not a question of whether they were preserved. It's a question of the fact that Illinois law requires an order or a possession to be obtained by the plaintiff in order to perfect or to enforce an assignment of rents provision. Well, what about the case law that says that affirmative action to constitute constructive possession will suffice? And all of those cases that we're talking about say what happened here doesn't constitute affirmative action. If you read, for example, the Comerica Bank case, which is a First District case. In that particular case, they said the mere filing of a foreclosure action or request for a receiver is not sufficient to trigger the mortgagee's right to collect the rest. But she also acknowledged in that case, the Purdy case, didn't she? Yes, absolutely. And that's what the bank here is relying on, partially at least. And that Purdy case was around 10 years before Justice Tice wrote the Comerica case. Correct. And all of these cases that discuss this requirement and the affirmative action that we're talking about, they outline a lot of different options short of actually getting a receiver appointed. They discuss a lockbox arrangement as one of the possibilities. They discuss an injunction. You could go to court and get an injunction that requires this. Well, why did the bankruptcy court then enter that order? What was the reasoning behind that? Which one? The order that segregated the – I thought the bankruptcy court entered an order that allowed the renters crossing to continue collecting rents, right? But didn't they have to segregate them or something? What was the order? Am I confused? No. That was the order I was thinking about, too. But what happened is when you file a check-out of a bankruptcy case, there are cash collateral orders that are entered. Right. That was what happened here. Right. And the cash collateral orders basically are allowing a debtor to retain in possession and use the rents that came in to pay expenses. And in this particular case, that order then also required our client to make affirmative $20,000 a month payments. You were paying them $20,000 a month every month during the bankruptcy. Correct. Would that have been close to or similar to the amount of rents? No. No? We wouldn't be here today because we're talking about the delta between what was collected above the payments to the plaintiff during that bankruptcy. Okay, but just explain to me, in addition to you making the payments, didn't the court segregate those funds? No. Why would they be segregated? What happens is when you file, you set up a debtor in possession account for the pendency of the bankruptcy. And so that's what happened here. And then it was accounted for in reports filed with the bankruptcy court. So there isn't an order that specifically said you can't do this, you can't do that, this money belongs to the lender. And the only reason why we're talking about this here is because What did the order say in effect? It specifically outlined that in order to protect the bank's collateral, we were agreeing to pay them $20,000 a month. There was nothing that, no segregation, no requirements that you work with the trustee or anything? No trustee was appointed. It's Chapter 11, Bankruptcy. I'm not a bankruptcy. The lender, if they were concerned about these rents and how they were being used, they could have gone to court and sought the appointment of a receiver. If there was fraud or incompetence. What was the contempt order all about? Tell me about that. The contempt order, at the beginning of the bankruptcy, there was a payment made to a trust of a couple thousand dollars. And it was not part of the original budget that went through, and I believe it was even before the cash collateral order was entered. And so the plaintiff's counsel filed the motion saying that that was an improper payment and it was paid back. The money was paid back into the estate. So it was a matter of a few, a month before that money came back. I think it was $5,000 or $7,000 total of a payment that was made to a trust as a creditor of the estate. Could you have asked while you were in the bankruptcy court to resolve the monies that Milestone supposedly was owed for whatever services, managerial, whatever? I believe so. So why didn't you? You know, I don't think it was mandatory that we do that. I mean, there wasn't anything that said that that had to be done. And this is probably beyond all the pleadings. I mean, the last six or eight months,  And you suggest in your brief that it was all their fault that the case didn't settle. Well, there was a settlement agreement that they drafted and then backed out of, and we had a hearing on it. And the judge said under the Illinois Credit Agreements Act that it's not enforceable until they sign it. I mean, that was a good five or six months of time that was spent on preparing for and doing these hearings and trying to resolve the case. So that was a large chunk of what happened within the bankruptcy case that is attempting to settle. One other question. Sure. So you would say that cash collateral or collateral, what is it? Cash collateral, yes. That that really was not a request to segregate rents? No, and I believe that if you actually look at the case of J.D. Monarch from 1993, it specifically says that a cash collateral order doesn't operate as that. What happened in that case, there was a trustee appointed, and the trustee took the position that the rents that were collected after the bankruptcy do not constitute banks, the banks have a right to those rents because they haven't taken the additional step. Because what they said in that case is you need to have to take over the negatives of being in possession of the property. You have to pay the expenses. You have to do everything that's associated with it. So we do have a Southern District of Illinois bankruptcy decision specifically on point that says right here, absent action by the bank, the debtor was entitled to receive the rents from the property until it was divested of possession. That was after a cash collateral order was entered in the case. So what they said in there is the bank's right is to get an adequate protection. The adequate protection in this case was the $20,000 a month payment. How many months did you pay the debtor? It was a total of – sorry, I have that in my – Well, how long were you in bank? I want to say it was 14 months or so. What's the case that says the cash collateral – $240,000 is the total. Cash collateral is not? J.D. Monarch. It's agreed. Yeah, yeah, yeah. No, I remember. All right. So the J.D. Monarch case is, I believe, the closest on the issue of whether or not a cash collateral order constitute an actual enforcement of an assignment of rents provision. This cash collateral being the additional step needed to enforce the assignment of rents has never been found in any case. I mean, I think that both sides are willing to acknowledge that there isn't any – If this Court were to find that these particular facts constituted enough for there to be an enforcement assignment of rents, it would be a first impression issue. Well, it probably is, regardless. Right. But I'm saying there's been a – since the early 90s, there's been a series of cases that all stand for the proposition that something affirmative, as far as an order or an agreement of some sort that's approved by the court, via TRO or lockbox, as we talked about, a receiver, mortgagee in possession. These are the mechanisms that all of those cases outline. So you would say that an order requesting to segregate rents is not the same as a cash collateral order?  That order wasn't to segregate rents. No, I know. I'm just saying. So there's a case, a bankruptcy case from Southern District of Illinois in 1982, which held that the court found that a request to segregate rents was sufficient affirmative action to constitute constructive possession under Illinois laws. It's in re Southern graphics. But your position would be clearly that that is not the order that was entered here, and this cash collateral order does not in any way segregate the rents. Anything to that effect? Right. And I also think that it's important that the cases that we cited in our briefs specifically say – Say the opposite. That the cash collateral orders are not affirmative action that would – Right. And cash collateral orders do not survive the dismissal of the bankruptcy either. So to allow the state courts to rely on cash collateral orders after the bankruptcy was dismissed would also have been improper. She gave multiple reasons for her decision to give these pre – what's the word? Pre-possession. Yeah, pre-possession. Yes. One of them was, you know, that she was calling it a frivolous bankruptcy, equitable principles. What else did she say? She gave a number of reasons. Right. And I think that at the time, I mean, everybody agreed that there wasn't anything directly with these sort of factors because it really doesn't come up that often if you think about it. Very rarely do you have a situation where you have a Chapter 11 bankruptcy where it generates sufficient enough income where this would ever be a fight. And then you also have to have the additional step that the bankruptcy had been dismissed because if a Chapter 11 had actually gone forward and a plan had been approved, there would never have been an argument that this belonged to the lender, regardless of the cash collateral. So that's another reason why it's not. It just so happened that the case was dismissed. That doesn't automatically turn the cash collateral orders into a possession-type order when if, like I said, if the Chapter 11 continued on, there would never have been an argument. And that's what J.D. Monarch says. So – Who wrote that decision? J.D. Monarch. Is that – we don't – what was the case where he starts with the purpose behind it? Is that the Marcos one that was – When he talks about the purpose behind the bankruptcy. Well – Yeah, so it's – the J.D. Monarch Southern District, so it wouldn't have been Judge Breedop on that one. No, no. Well – So I guess my point is that this does have longstanding effects depending on how this Court rules because it takes – Chapter 11s are there to allow a debtor to try to restructure their debt. And if they're faced with the thought that if the bankruptcy eventually gets dismissed, whether it's the next day or two years from now, all of a sudden, that all of a sudden now goes to the lender, it could potentially impact how those are actually operated. So for good or for bad, I believe that there will have longstanding policy impacts depending on how this Court rules on that particular issue as it pertains to the – how a Chapter 11 bankruptcy is actually going to go forward. As I said, we studied a series of cases from the 90s to now that I believe that stand for this proposition that what we did here – I mean, there was – they could have had a trustee appointed, we talked about. There are a lot of additional steps that could have been done. They could have sought relief from stay. This bankruptcy proceeded for a serious – for a long period of time. There was – if they believed that they weren't adequately protected, they could have asked to go back to state court. They did not do so. Are we talking about a little over half a million dollars that was used to satisfy part of the interim judgment? It's less than 300,000 because – It's less than 300,000? Correct. That's what you're all here for? Correct. The total amount that was ordered turned over because the judge did – there was also an amount that predated the bankruptcy, and the judge said that amount we do get to keep. So we're talking about from the date that the cash collateral order was entered until the bankruptcy was dismissed. That's the amount that we're actually talking about here. It's $278,341 or so is what we're talking about. Mr. Toussaint, I know you wanted to share some facts with us. Thank you. Thank you. Mr. Perceda. Yes, thank you. Having heard Mr. Toussaint's presentation, the one item I want to make most clear right at the start is that the appellant is conflating three separate events that took place in bankruptcy court here. There was a cash collateral order entered on consent of the parties that provided for the maintenance and upkeep of the property out of the rents collected. There were also payments made, but they were not subject to any order. The payments made were automatic payments that come due under 362D3. Are you talking about the $20,000? Yes, the $20,000 a month. Those have to be commenced automatically under 362D3 of the bankruptcy court. How is the figure computed? How did the $20,000 get calculated? It's the non-default interest rate on the mortgagee's interest in the property of the estate. So there's some term of art there, but the gist of it is it's the non-default interest rate applied to the value of the collateral. So that's how that's calculated. Well, do you agree with counsel's interpretation of the Monarch case that the cash collateral order does not in any way amount to action to constitute constructive possession? I think if a creditor does nothing in the bankruptcy court and relies simply on the self-imposed, automatically applicable criteria of the bankruptcy code, yes, I think that's a problem for the creditor. However, two points on Monarch, Your Honor. One is that there are subsequent cases that largely view Monarch as abrogated by the Wheat and Milk case as well as the Conveyances Act. And secondly, the creditor in Monarch did nothing. They didn't ever seek any sort of affirmative protection in the court. And the point I need to draw home here, Your Honor, is that we didn't just get a cash collateral stipulation setting forth a budget and clarifying what amounts could be spent. I went in and made an affirmative motion in the bankruptcy court to get an entirely separate order that stated exactly in the fashion Your Honor suggested earlier that the debtor was prohibited from using any rents without permission of the lender or the court and that it was directed to segregate and account for all of the rents. So there was an order. Yes. Your position is that the cash collateral order, separate and apart from an order that you sought via a motion to segregate the rents and that the debtor in possession was not allowed to do anything with those rents without permission from the court? Yes, two separate orders, Your Honor. So would you say that that order, I mean, that's the order you're relying on, aren't you, to say that there was affirmative action taken? Under a separate set of facts, Your Honor, I would be here arguing that under the modern state of the law, the cash collateral order itself would have been sufficient. But we don't need to address that more extreme fact pattern today. Because we do have it. It's a May 20th order, Your Honor. It appears in the record at volume 4, page 920, and it is an order that is separate and distinct from the cash collateral order that does exactly the things you were asking about earlier. So then during the bankruptcy, was there any of the, was the ranch hearse crossings, were they coming in and actually making requests to do certain things with the rents or not? No, Your Honor. Nothing was done, but there was an order in place that they had to be segregated and they couldn't do anything with them unless and until the court gave permission. Right. And under the auspices of that order, a separate agreed stipulation, so ordered by the court, that provided a budget for maintenance and operation of the property. And operation. Correct. So were there disbursements then for those things, the maintenance, the operation, the upkeep? Yes. The debtor in possession was entitled under the cash collateral order to withdraw those certain specifically identified amounts to be spent on those specifically identified expenses of upkeep and maintenance. And are we in agreement that what's at stake here is about something less than $300,000? I believe it's $278,000, Your Honor, and it represents the surplus rents above and beyond those spent on the expenses we've just discussed that were collected after the May 20, 2014 order directing segregation and prohibiting use of the rents was entered. It's the surplus rents collected after that date through the end of the bankruptcy and not otherwise disbursed for either the 362D3 payments  So those rents are entirely surplus. And really, what the question comes down to before the court today, Your Honor, as I see it, is that we need to decide, and you all get the pleasure of deciding, whether under Illinois law, where a lender has a perfected security interest in the rents, where it has gone to the court and gotten an affirmative order prohibiting the borrower from using the rents, directing the borrower to segregate and account for the rents, where that same lender has provided for funds to be available for the maintenance and upkeep of the property, and where that lender has paid the taxes itself directly, if under those circumstances we're going to declare that the surplus rents should be turned back over to the borrower, notwithstanding its failure to pay the mortgage, or if those rents should be turned over to the mortgage lender for application to the deficiency on the mortgage debt. Well, what I don't really understand is that during this 14-month period, if these rents were being collected by a debtor and there weren't any other, what was being done during that? I mean, were there actual operating expenses, managerial expenses, or upkeep that were actually being used at that time, or not? They were small. Your Honor, this is a rental property, so there weren't enormous... I understand what it is. It's a shopping center. I happen to have grown up in the area, so I know where it is. I mean, I know what it is. The largest expense were running away with the real property taxes. And those were not... And those were paid directly. So they were not dealt with in the cash collateral. The remaining expenses were minor. They were general maintenance expenses, snow removal, that sort of thing. So it was really the taxes were the big thing, and your client paid those. That is correct. What about your fees? Think you're entitled to double bill when you've got... sitting in the courtroom and you're billing for the same work, essentially? I mean, really? Well, your Honor, I'll start by acknowledging the fees are large in this case. It's not about their size. It's about... They were... I thought they were $500,000 or something. What were the amounts? It's $590,000 or something. Right, right. And then the actual... Whatever, the judgment was five plus, right? Five million plus. Yes. I'm not... This is not about the amount of the fees. You say in your brief that they didn't argue anything was duplicative. But they are arguing, aren't they? Aren't they arguing that when there was billing for your counsel and local counsel for hearings, that that was duplicative? They are. All right. So, is it? I don't believe it is, Your Honor. All right. You tell us why. Okay. Well, Your Honor, you need to understand it, and this was gone through at great length with Judge Loftus before the trial court. I don't typically come to these hearings unless there is a case that proves to be a problem. This case very early on proved to be a problem. It has continued to be a problem since the earliest stages. I don't think we need to get into the details of why it's been a problem. I think the fact that we're all here and the briefs before you show that it's been an extraordinarily litigious situation. I would suggest that when you have a client that has a national practice, there are times when that client is entitled to have its primary home counsel come and attend those hearings. No problem. I don't disagree. But do you think that it's reasonable for not only you but local counsel to be billing for presence at a hearing? Especially when you're dealing with a bankrupt estate or whatever you want to call them. I can only say, Your Honor, that the trial court found Ms. Pisano's presence to be useful at various times, and I do believe we have in the transcript somewhere in the record that her total fees in this case are somewhere in the neighborhood of $30,000. So it really is a drop in the bucket in the grand picture. All right. Well, you know, there's some explanation. Let me ask you about your fees for travel. Where does that come from? I live in Baltimore. No, I know that. But do you get to bill for the 40, how many hours was it, that they're questioning? Honestly, Your Honor, I don't know what they've isolated in terms of travel. Okay. Well, let me. Were you billing when you were in the airplane? On general practice, Your Honor, I try to work on the airplane. So, you know, without having a specific line item in a bill to respond to, generally I try not to just bill when I'm in the airplane. Honestly, I don't always. But it was a general course when somebody has a, you know, a practice from state to state to have local counsel with you. Yes, and I'm not even entirely certain that I would have been permitted to be at some of the hearings without having local counsel with me. Generally, I relied on, you know, local practice to guide me in that. And it was a little bit of trouble with the speed of travel, Your Honor. It was 74 hours. You may be correct that you can't be in a parent pro-hoc PCA without local. You've explained that co-counsel's hours ended up being something like $30,000 for the 74 hours. But here's the number for the travel, $46 for travel time. And that ended up being about $25,000. That's, look, it's apparent, Your Honor. I don't blame counsel for raising it. Is then your retainer contract that you get that kind of money? With the client? Yes. It is. Yes. And how about your meals and your hotel room and things like that? Is that all in your contract? Those are the expenses of having me here, Your Honor. I just want to know whether it's in your contract with your client. Oh, well, to be completely candid, Your Honor, I don't want to be. This client isn't my client. Those bills are handled at a pay grade that is above my head. But we have cases like this all over the country. And, you know, we handle them generally the same way when they become troublesome like this. But they didn't really protest too much. They only suggest there was one meal. So I don't know if that's even. But, you know, we are, you know, interested in knowing. I'm not suggesting anything by my questions. But I want to know. No, I understand. And I can understand. I don't think there's any question that, you know, counsel like yourself, and even counsel on the other side, that, you know, we're working at all times. And with technology, it's easy. We can do it. We can be in, you know. So I'm not, I just, you know, this is an issue. I think it's a fair issue. And, you know, you've answered some of my questions, so. No, certainly it's an appropriate topic for inquiry. I will point out that I don't think it actually gets to any of the larger issues or objectives in this case because. Well, I think they had a point when they said that when you initially made your petition for a tariff you did not supply the court with an affidavit as required. Isn't that correct? That is initially correct, Your Honor. And then, well, one thing I want to make clear that I think was not correct in Mr. Tuesday's presentation is we had multiple hearings on summary judgment. While the decision on the appease was made as part of the summary judgment proceedings as a whole and without an evidentiary hearing, we had a hearing first in which Judge Loftus granted summary judgment just as to liability. And then she ordered everybody to conduct an entirely separate and additional round of production and I think we had a briefing, but more to the point, production and enhanced affidavits and additional unredacting, and that's additional removal of redaction from the attorney's fees as part of those affidavits in production, which produced an additional round of papers and an entirely additional hearing. So to the extent, I don't read Room 191 as making a meaningful distinction ultimately between whether or not those papers are provided as part of the initial. You subsequently supplied them, did you not? Yes, yes, they were all supplied and they were supplied in a manner in which the borrower here had a full and fair opportunity to respond. We had an entirely separate hearing with additional oral argument on those freedoms. So really what counsel is arguing here is that 191 requires without exception that the papers, the backup, the bills be attached to the initial affidavit and that there's nothing the trial court can do thereafter to grant summary judgment short of denying summary judgment and starting the whole process over again. I don't see what the function of that is. It seems to me Judge Loftus had a perfectly good solution to that. She granted summary judgment on what she could. She sent the parties back to redo the papers and provide additional papers complying with Room 191 and she issued her decision. I suppose we could go back and remand and do it all again in front of her, but I don't know that that would be a meaningful act or that it would advance any of the purposes of Room 191 at this point since counsel has had those papers for years now. Right, but I don't know that the argument right here and now is so much, I mean that's certainly part of it, but then there is this other part of the equation where your opponent is arguing that the billing for the 46 hours of travel time, that the 74 hours to attend hearings with local counsel, but yes, he is also arguing 191, but there's a two-fold sort of argument here. But I think you've explained your position. There is some questions about whether, you know, the 43 hours to negotiate the settlement was reasonable, whether the, and there's 34 hours or 35 where they're claiming the work wasn't really related. Now, you return some of these, but I think you've addressed in your brief your position of the breadth of the provisions in the contract that allow, I think on three occasions, a description of what attorney fees would be allowed. So, I mean, I think that's important. Yes, Your Honor, and I guess my only closing comment on that is that Judge Loftus had a front row seat for a lot of this litigation, and, you know, I would suggest that this Court was in the best position to know from having seen it what was reasonable, what was driven by the intensity of the litigation in this case, and the breadth of the litigation that we undertook. This is only the latest of some extremely interesting and very hotly contested issues that we've dealt with in this case, Your Honor. I would like to, if I have just a moment left, address the Conveyances Act, because I think it's a particularly interesting aspect of this that is relatively new to the case. Just as an opening remark, I know that counsel thinks that the Court doesn't have any ability to review that because it wasn't specifically part of the lower court case. I don't think that's the situation. I think we all know that this Court can uphold the lower court's decision on any grounds that are apparent in the letter. Yes, this is not something you forfeit. We agree with you there. Okay. And I'm a little surprised I haven't seen more case law on the Conveyances Act in this type of setting since it's been around since 1996. But the Contorino case, which is a very recent case, I think provides a window into how the Conveyances Act affects the situation here, and that is it provides a statutory overlay on the common law aspects of control of the rent that we've discussed earlier. In particular, the Conveyances Act specifically provides that while applicable law is what you look to as between determining who's entitled to the rents normally, it carves out the situation if the parties have otherwise agreed to some other procedure here. Now, here, I think the Conveyances Act has two impacts. One is I would argue in the first instance that the mortgage in this case and the assignment of rents very specifically consist of a separate agreement among the parties concerning how the rents were going to be collected and applied after default. But don't you still have to make efforts to enforce that? It's just kind of like the other thing that there has to be affirmative action. You may have perfected it, but have you thought to enforce it? Well, two measures to that, Your Honor. Yes, and that in many ways just takes us back to the May 20th order in the bankruptcy court wherein we got the court to affirmatively prohibit use of the rents going forward. But even in the absence of that order, Your Honor, I would be arguing that the Conveyances Act in kicking that analysis to private agreement among the parties requires the court to look to the private agreement among the parties. And I would cite to the Contorino case as an example of that where there was no court action at all in the Contorino case, and the court found that the lender had adequately enforced its right to the rents merely by agreeing with the borrower that the rents would be collected for the lender's benefit going forward and held by the borrower's managing agent. There's no court action at all here, and that is in many ways a much narrower and more permissive view of the law and is being argued by the borrower in this case because in this case we have court action. We have an order with the court. We have activity of the lender to enforce the situation. Was the Conveyances Act, though, ever addressed in any of your pleadings? The Conveyances Act is addressed at length in my appeal brief, Your Honor. No, I meant in the trial court. No, no, no. I don't agree with the notion that if you're raising something for the first time, it's aptly that you quote it in the argument. But at the same time, I'm curious to know, and I think counsel is correct, that you did not raise this argument before Judge Loftus at any time. He is correct. We have a lovely searchable record. I looked for the word conveyances in it. I did not find it. My position would simply be that the substance of it was thoroughly discussed and that the record is entirely complete in any way that would be necessary to consider the Conveyances Act before this forum. Thank you, Mr. Prosido. Thank you very much. It was a pleasure to be here. Welcome, Your Honor. Thank you. Mr. Tuesday. Just really quickly, a couple of points of clarification from what Mr. Prosido had. How about a clarification on the order? On the May 20th order? Yes. You have to go to court when you start a new bankruptcy, set up a debtor in possession order, and that cash collateral order was an order that we prepared. I'm not talking about the cash collateral order. Which order? Counsel says that the bankruptcy court entered a separate order. No, this is all part of the same order we're talking about. It's the same May 20th 2014 order.  I don't see anything in the record that shows this. Are there any words in there about segregating the rents and that the renters crossing cannot do anything with those funds unless and until it gets permission from the court? That order, yes, required the funds to be placed into this debtor in possession account subject to budgets that were being done throughout the course of the bankruptcy. All of that is absolutely true. Were the rents in that order? Yes. Was there language to the effect that the rents were to be segregated? Every single thing went into this one debtor in possession account. So that's what I'm saying. So, yes, every single rent proceeds from the property, anything, all went into. I thought it was two different orders. But he says he asked for a separate or some order that actually included language that the debtor in possession, the collection of all the rents was to be segregated and that the debtor in possession could not do anything with those rents unless the court gave permission. That's just as general rules as you need to do to be a debtor in possession in any bankruptcy. That's just the same standard cash collateral order that's entered. So it's really we're the ones that bring the motion so that we're allowed to operate. So that was brought on a motion by the debtor to enter that order that allows for, as Your Honor mentioned before, the payment of ongoing expenses and things like that. I don't know. I guess this is some kind of battle of words here. But I'm trying to find out. So you're saying that any time you're in the Chapter 11, the debtor in possession is going to be ordered to segregate the rents. Absolutely. And so there's nothing unique about this particular cash collateral order that takes us outside of the J.D. Monarch case, for example. And it is the Ian Lee Marcos bankruptcy that Your Honor was asking about before with Judge Weedoff, the Marcos Gurney bank partnership case. In that one, there was a Chapter 11 case that was converted to a Chapter 7 case. And the court said that the lender was only entitled to the value of the property at the time of the bankruptcy filing, not the excess funds collected during the bankruptcy estate. So even Judge Weedoff in that particular case in 1997 also said the same thing. And I think it's important here that these – I said this briefly in the original. There's two cases that we cited that specifically stand for the proposition that the cash collateral orders did not survive the dismissal of the bankruptcy case. So the Venetian – Well, forget about whether they survived. Are they affirmative acts? I mean, I don't think it matters whether they survived or not. The question was did they – were there affirmative acts taken? But you're saying that the cash collateral order was yours.  That you requested. It's automatic. There's always the segregation of the rents. That's correct. And we did make these protection payments that we talked about. Yes. Which were under 362D3 of the Bankruptcy Code. We could either make these payments or we could have gone forward and filed a plan of reorganization. We never got to that point in the court. On our motion, which was objected to by the bank, dismissed the case and sent the case back to state court. And so I think this is a weird interplay of a unique situation between the bankruptcy court and the state court. But this was not an affirmative act. This doesn't fit under any reported decision to date that that constitutes enough of an affirmative act to not only have a protected security interest – I mean, a perfected security interest, which everyone agrees they did by the reporting. But they didn't enforce the security instrument under any current state of the law. That cash collateral order does not count. Just briefly, what about the Conveyances Act? The Conveyances Act is interesting because I read this case multiple times. I've read it multiple times since it was cited in the response brief. And I don't believe it actually helps the plaintiff here in this particular case because it specifically says that it references you could go to court and get a lockbox arrangement or you can have a direct payment system set up. It specifically outlines things that did not happen here. And in this case, they tried to raise 31.5 of the Conveyances Act. And the court in that case found against BMO Harris. If you read the whole thing, the trial court ruled in the Adverse Claimants Framework against BMO. They affirmed it. So that case actually does – they tried the Conveyances Act claim BMO and it was rejected by the court. So I'm not exactly – there isn't a single case out there from before the appeal or after the appeal that says that the Conveyances Act trumps possession. And so that's the argument that counsel was making. Somehow they're relieved of the requirement to obtain this affirmative possession step by the Conveyances Act. The disargument was that they took that affirmative action in the bank. Correct, which I think all recorded decisions say otherwise. All right. Thank you very much. All right. The court will take the matter under advisement and issue an order as soon as possible. Perfect. Thank you.